**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 17, 2023**

# In the Court of Appeals of Georgia

A23A0933. OVATION CONDOMINIUM ASSOCIATION, INC. v.
COX.

DOYLE, Presiding Judge.

Alys W. Cox sued Ovation Condominium Association, Inc. ("Ovation"), asserting claims for nuisance, negligence, breach of contract, and punitive damages for personal injury and property damage she alleged resulted from soot and exhaust that infiltrated her condominium unit from a diesel-powered backup generator installed nearby in the building's parking garage. Ovation moved for summary judgment and to strike the testimony of two of Cox's experts. Without entering a written ruling on the motion to strike, the trial court denied Ovation's summary judgment motion, and this Court granted its subsequent application for interlocutory appeal. Because it appears that the trial court failed to determine the admissibility of

Cox's expert testimony, we vacate the summary judgment order and remand the case with instruction.

The record shows that Ovation owns a 19-story condominium building in Buckhead. During construction in 2005, a diesel-powered emergency generator was installed on the same level as the underground parking garage. Ovation's Condominium Declarations ("the Declarations") provide, in relevant part, that Ovation is responsible for maintaining and keeping in good repair the building's life safety and other systems, which include the generator. Accordingly, Ovation contracts with a third party — Kraft Power — to maintain and repair the generator, including bi-weekly tests and routine inspections. During the tests, the generator runs for approximately 30 minutes. The diesel exhaust produced by the generator is expelled through a pipe that ends on an external wall of the building.

In February 2006, just after the building was constructed, Cox purchased and moved into Unit 210, located on the building's first floor in close proximity to the generator. Cox alleges that she could smell the odor of burning plastic in her condominium whenever the generator ran. After living in the building for approximately nine years, she began experiencing headaches, migraines, facial swelling, and cognitive issues. The symptoms became increasingly severe, and

according to Cox, by 2019 her symptoms were "intense." Additionally, a number of items of her personal property began showing signs of discoloration and physical deterioration.

Cox's symptoms became so bad that she moved out of the building in November 2019, and she placed personal property from her unit into storage because exposure to those items aggravated her symptoms. Shortly after moving out of her condominium, Cox contacted her homeowner's insurer — State Farm — which arranged for inspections of and testing on the interior of Cox's unit by two different environmental companies. The first company, Heaton Environmental, Inc. ("Heaton"), found that the "volatile organic compound" levels in the air samples taken from the condominium were in the "acceptable recommended range" for a residence. The Heaton report further noted that the unit's air showed "minor levels of chemicals and compounds resulting from gasoline fuel" and that "[i]ndividuals with extreme sensitivities may be impacted to some degree [by] the levels measured."

An environmental engineer for the second company hired by State Farm — the Culpepper Group ("Culpepper"), an "industrial hygiene and indoor air quality consultant" — visited the condominium building twice and swabbed interior surfaces in Cox's unit as well as the generator's exhaust pipe. Samples from both inside the

condominium and the exhaust pipe showed the presence of "CBP soot," which is a byproduct of burning diesel fuel. The report concluded that the presence of the soot in Cox's unit likely resulted from generator exhaust and that such exhaust would also explain the odor of burning plastic Cox had experienced. The report theorized that at least some of the exhaust entered the building's wall cavities and was drawn into Cox's condominium because of "negative pressure" between the inner walls of the unit and the outer walls of the building. Additionally, the report noted that the diesel exhaust fumes had stained the unit's carpet beyond repair and recommended that management redirect the exhaust fumes away from the building;[1] clean the unit's HVAC systems; and seal "all exterior penetrations in the air supply boots with appropriate silicon sealant." Culpepper also recommended that the upholstery, floors, walls, and cabinets in Cox's condominium be professionally cleaned. Finally, the report contained pictures showing the black "soot deposits" in the interior of Cox's condominium, as well as the discoloration of some plastic items found in the unit.

After receiving the Culpepper report, Cox scheduled a meeting with Ovation's Board of Directors in March 2020. At that meeting, Cox presented the Board with the

---

[1] This recommendation was based on the consultant's observation that the generator's exhaust left the building near vents that appeared to be air intakes.

4

Culpepper report and asked for a solution to the infiltration of diesel particulates into her unit, as well as an abatement of her Association fees until the issue was resolved and she could resume living in the unit. The Board declined Cox's requests to waive her Association fees temporarily and to abate the particulates and instead had the generator inspected by Kraft Power, the company under contract to maintain it. The maintenance company inspector reported that he "witnessed . . . a very light puff of smoke at start up" of the generator that "cleared almost immediately." The inspector further found that while operating, the generator produced only "faint exhaust" that "blows straight out from the building and across the two lane road," "switching directions dependent on the wind." The inspection "yielded no telltale concerns associated with overfueling, light loading, or engine malfunction," and the inspector concluded that the generator had "a very clean running diesel engine. The exhaust this unit is contributing to the neighborhood is minimal and likely only a fraction of that contributed by delivery trucks and the 4-5 other generators exhausting into the loading dock area [] within less than 100-150 [feet] of this one." The inspector stated that Kraft Power would perform another annual load test and a service, which would include an oil sample.

Based on the report of the maintenance company, the Association took no further action. In October 2021, Cox filed the underlying lawsuit against Ovation, asserting a claim for property damage under a nuisance theory, a claim for personal injury sounding in negligence, and a breach of contract claim under the Declaration.

Cox relied on two experts to support her claims. Robert Springer, MD, who specializes in allergy, immunology, and primary care, deposed that he treated Cox for what he thinks was an "immune-mediated reaction to a substance that appeared . . . linked to her condominium environment . . . [based o]n her repeated experience of returning to the condo environment and having her symptoms be aggravated or expressed." Springer opined that "if there was something that was absolutely toxic in her environment . . . it's a unique immune response on her part" that is "[a]bsolutely" unique to her. Springer was not able to "pinpoint the offending agent" and could not rule out mold, paint, dust, pollen, or perfume as the triggering agent for Cox's symptoms.[2] He deposed that he could not speak to what Cox had been exposed to, whether there was a dangerous level of volatile chemical compounds in her unit,

---

[2] At the time of his deposition, Cox was Springer's "sole source" that there was diesel in her unit.

or whether she had been exposed to a level above any public health or medical standard.

Cox's second expert, Benjamyn Marks, CIH, CSP, an environmental, health, and safety consultant who did not visit her condo, offered his "Declaration" which was based on his review of the Culpepper report, reports by another group, and photographs, emails, and notes. The Declaration essentially summarizes and concurs with the Culpepper report, including that Cox's unit was "negatively pressurized with respect to [its] exterior wall cavities," that combustion by-product soot identified in her unit "had similar chemical make-ups to that . . . identified on the diesel generator's exhaust pipe," and that the soot in her unit "was likely caused by the diesel generator's exhaust emissions migrating into [her unit]." During his subsequent deposition, Marks reiterated his statements in the Declaration. He also recommended that the items in Cox's unit should be cleaned appropriately, though he admitted that he had not personally examined them. Marks also conceded that he did not consider any sources for the diesel levels found in Cox's unit other than the backup generator.

Ovation moved for summary judgment, arguing that Cox could not carry her burden of proof as to her tort and contract claims; that she could not prove that Ovation's conduct was the proximate cause of any injuries she suffered; and that she

could not prove damages recoverable against Ovation. In response, Cox submitted new affidavits from Springer and Marks.

Springer stated in his affidavit that after reviewing the Culpepper report, he became aware that Cox's unit was "being infiltrated" with exhaust from the building's backup generator, which information "helped identify the environmental toxin" causing her health issues. Springer stated that he had eliminated car or truck exhaust from the road as a cause of Cox's health problems and "believe[]s that exposure to diesel particulates in [her] condominium is the cause of [her] symptoms because of the timing of her symptoms and [the] fact that she feels relief only while being away from the condominium."[3] Springer also opined that he "[did] not believe [Cox] is abnormal in her sensitivity to diesel exhaust. [Her] symptoms are a reasonable reaction to a repeated exposure to a known environmental toxin."

In his affidavit, Marks explained that indoor air quality assessments performed on Cox's unit during testing of the generator did not reveal any higher readings of sub-micron particulates, although a nearby unit did have "substantially higher" readings. Marks opined that discoloration in the carpeting in Cox's unit along the

---

[3] According to Springer, "diesel exhaust . . . is a known environmental toxin that can cause deleterious health effects in otherwise healthy individuals."

8

wall closest to the generator indicates that the carpet is filtering the generator exhaust being pulled into her unit by negative pressurization, resulting in the presence of soot "well [] beyond normal household levels." According to Marks, those levels of soot "can damage . . . property," and he "do[es] not believe there is any . . . plausible source for the soot" other than the backup generator.

Ovation filed motions to strike Springer's and Marks's affidavits on the grounds that they failed to meet the requirements of OCGA § 24-7-702 and *Daubert v. Merrell Dow Pharmaceuticals*.[4] Without ruling on the *Daubert* motions, the trial court denied Ovation's summary judgment motion in a two-page order. Ovation filed an application for interlocutory review, which this Court granted, and this appeal followed.

"The four elements to any tort action are a duty, a breach of that duty, causation and damages."[5]

> To establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury. The plaintiff must introduce evidence which affords a reasonable

---

[4] 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

[5] (Citation omitted.) *Traina Enterprises v. RaceTrac Petroleum*, 241 Ga. App. 18 (525 SE2d 712) (1999). See also OCGA § 51-1-1.

basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant.[6]

The diagnosis and potential continuance of a disease or other medical condition are medical questions to be established by physicians as expert witnesses and not by lay persons. Thus, we have required expert medical testimony, based at least on reasonable probability, to establish a causal link between exposure to a substance and a medical condition.[7]

"[P]roof of causation in [toxic tort] cases generally requires reliable expert testimony."[8]

---

[6] (Citation and punctuation omitted.) *Barrett Properties, LLC v. Roberts Capitol, Inc.*, 316 Ga. App. 507, 509 (1) (729 SE2d 621) (2012), quoting *Grinold v. Farist*, 284 Ga. App. 120, 121-122 (1) (643 SE2d 253) (2007).

[7] (Citation, punctuation, and emphasis omitted.) *Seymour Elec. & Air Conditioning Svc. v. Statom*, 309 Ga. App. 677, 680 (710 SE2d 874) (2011).

[8] (Citation and punctuation omitted.) *Cleveland v. Sentinel Ins. Co.*, 354 Ga. App. 795, 798 (1) (b) (840 SE2d 738) (2020), quoting *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 30 (2) (712 SE2d 537) (2011).

"OCGA § 24-7-702 ("Rule 702")[, which] governs the admissibility of expert testimony and requires that the trial court act as gatekeeper to ensure the relevance and reliability of expert testimony,"[9] provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.[10]

"[A] medical doctor's opinion regarding causation falls within OCGA § 24-7-702 and must satisfy *Daubert*."[11]

Pursuant to former Rule 702, the trial court "must consider: (a) the qualifications of the expert; (b) the reliability of the testimony; and (c) the relevance

---

[9] (Punctuation omitted.) *Kershaw v. Princeton Properties Mgmt.*, 348 Ga. App. 779, 782 (824 SE2d 668) (2019) (physical precedent only), quoting *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016).

[10] OCGA § 24-7-702 (b) (2021).

[11] *Kershaw*, 348 Ga. App. at 783.

of the testimony. Thus, Rule 702 imposes a special obligation upon the trial judge to act as gatekeeper."[12] As such, the trial "court *must* do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[13] Appellate courts review a trial court's determination of whether an expert is qualified for a "manifest abuse of discretion."[14] "A trial court, however, abuses its discretion by failing to act as a gatekeeper."[15]

In this case, Ovation moved to strike the affidavit testimony of Springer and Marks. The trial court denied summary judgment in a succinct order without mention of or a ruling on the *Daubert* motion.[16] Thus, we do not know whether the trial court

---

[12] (Punctuation omitted.) Id., quoting *Scapa Dryer Fabrics*, 299 Ga. at 289 (addressing former OCGA § 24-7-702).

[13] (Punctuation omitted; emphasis in original). *Kershaw*, 348 Ga. App. at 783, quoting *McClain v. Metabolife Intl.*, 401 F3d 1233, 1237 (II) (11th Cir. 2005).

[14] *Kershaw*, 348 Ga. App. at 783-784, citing *HNTB Ga. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010).

[15] (Punctuation omitted.) *Kershaw*, 348 Ga. App. at 784, quoting *McClain*, 401 F3d at 1238 (II).

[16] Because the record does not contain a transcript of the summary judgment hearing, we do not know whether the motion to strike was addressed or even mentioned at the hearing.

12

considered the admissibility of Cox's experts' testimony, which ruling may be dispositive of Cox's claims, each of which requires evidence of causation.[17] Therefore, "[b]ecause this is a role for the trial court, and our review is limited to determining whether the trial court abused its discretion, we conclude that we must vacate the trial court's order and remand for the trial court to conduct a proper *Daubert* analysis."[18]

---

[17] Though Ovation did not enumerate as a separate error the trial court's failure to rule on the motion to strike, it contends in its brief that the failure to do so was erroneous. We further note that before the trial court ruled on the summary judgment motion, Cox amended her complaint to add claims for breach of fiduciary duty and punitive damages; those claims were not addressed in the summary judgment order, and they remain pending.

[18] *Kershaw*, 348 Ga. App. at 784, citing *Lavelle v. Laboratory Corp. of America*, 327 Ga. App. 142, 147 (2) (755 SE2d 595) (2014). "While the trial court was not required to make specific findings of fact relating to these statutory requirements [under Rule 702], the trial court's rulings did not adequately demonstrate that the trial court performed its role as gatekeeper[.] . . . For this reason, we vacate the ruling excluding [the expert's] opinion and remand the case for the trial court to fulfill its role as gatekeeper." *Lavelle*, 327 Ga. App. at 147 (2) (citations and punctuation omitted), citing *An v. Active Pest Control South*, 313 Ga. App. 110, 114-115 (720 SE2d 222) (2011) (explaining that appellate courts "must be cautious about deciding questions of admissibility — including questions of the admissibility of expert opinions — upon which a trial court has not ruled. . . . Whether an expert opinion ought to be admitted . . . is a question that is especially fit for resolution by a trial court because it requires a consideration of the facts and data upon which the opinion is based. . . . All these things may require fact finding, and trial judges are better suited to find facts than appellate judges.").

*Judgment vacated and case remanded with instruction. Gobeil, J., and Senior Judge C. Andrew Fuller concur.*