**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 10, 2025**

# In the Court of Appeals of Georgia

A24A1374. OVATION CONDOMINIUM ASSOCIATION, INC.
v. COX.

BROWN, Judge.

This is the second appearance of this case before this Court. In *Ovation Condo. Assn. v. Cox*, 369 Ga. App. 481 (893 SE2d 867) (2023) ("*Ovation I*"), we vacated the trial court's summary judgment order and remanded the case for the trial court to determine the admissibility of Plaintiff Alys Cox's experts' affidavits. Id. at 487. On remand, the trial court denied Defendant Ovation Condominium Association, Inc.'s ("Ovation") motions to strike and re-entered its denial of Ovation's motion for summary judgment. Ovation appeals from this order. For the reasons explained below, we affirm in part and reverse in part.

The relevant background is set forth in detail in *Ovation I*:

The record shows that Ovation owns a 19-story condominium building in Buckhead. During construction in 2005, a diesel-powered emergency generator was installed on the same level as the underground parking garage. Ovation's Condominium Declarations ("the Declarations") provide, in relevant part, that Ovation is responsible for maintaining and keeping in good repair the building's life safety and other systems, which include the generator. Accordingly, Ovation contracts with a third party — Kraft Power — to maintain and repair the generator, including bi-weekly tests and routine inspections. During the tests, the generator runs for approximately 30 minutes.[1] The diesel exhaust produced by the generator is expelled through a pipe that ends on an external wall of the building.

In February 2006, just after the building was constructed, Cox purchased and moved into Unit 210, located on the building's first floor in close proximity to the generator. Cox alleges that she could smell the odor of burning plastic in her condominium whenever the generator ran. After living in the building for approximately nine years, she began experiencing headaches, migraines, facial swelling, and cognitive issues. The symptoms became increasingly severe, and according to Cox, by 2019 her symptoms were "intense." Additionally, a number of items of her personal property began showing signs of discoloration and physical deterioration.

Cox's symptoms became so bad that she moved out of the building in November 2019, and she placed personal property from her unit into

---

[1] Ovation asserts that the generator runs fewer than 16 hours annually.

storage because exposure to those items aggravated her symptoms. Shortly after moving out of her condominium, Cox contacted her homeowner's insurer — State Farm — which arranged for inspections of and testing on the interior of Cox's unit by two different environmental companies. The first company, Heaton Environmental, Inc. ("Heaton"), found that the "volatile organic compound" levels in the air samples taken from the condominium were in the "acceptable recommended range" for a residence. The Heaton report further noted that the unit's air showed "minor levels of chemicals and compounds resulting from gasoline fuel" and that "[i]ndividuals with extreme sensitivities may be impacted to some degree [by] the levels measured."

An environmental engineer for the second company hired by State Farm — the Culpepper Group ("Culpepper"), an "industrial hygiene and indoor air quality consultant" — visited the condominium building twice and swabbed interior surfaces in Cox's unit as well as the generator's exhaust pipe. Samples from both inside the condominium and the exhaust pipe showed the presence of "CBP soot," which is a byproduct of burning diesel fuel. The report concluded that the presence of the soot in Cox's unit likely resulted from generator exhaust and that such exhaust would also explain the odor of burning plastic Cox had experienced. The report theorized that at least some of the exhaust entered the building's wall cavities and was drawn into Cox's condominium because of "negative pressure" between the inner walls of the unit and the outer walls of the building. Additionally, the report noted that the diesel exhaust fumes had stained the unit's carpet beyond repair and recommended that management redirect the exhaust fumes away from

the building;[2] clean the unit's HVAC systems; and seal "all exterior penetrations in the air supply boots with appropriate silicon sealant." Culpepper also recommended that the upholstery, floors, walls, and cabinets in Cox's condominium be professionally cleaned. Finally, the report contained pictures showing the black "soot deposits" in the interior of Cox's condominium, as well as the discoloration of some plastic items found in the unit.

After receiving the Culpepper report, Cox scheduled a meeting with Ovation's Board of Directors in March 2020. At that meeting, Cox presented the Board with the Culpepper report and asked for a solution to the infiltration of diesel particulates into her unit, as well as an abatement of her Association fees until the issue was resolved and she could resume living in the unit. The Board declined Cox's requests to waive her Association fees temporarily and to abate the particulates and instead had the generator inspected by Kraft Power, the company under contract to maintain it. The maintenance company inspector reported that he "witnessed . . . a very light puff of smoke at start up" of the generator that "cleared almost immediately." The inspector further found that while operating, the generator produced only "faint exhaust" that "blows straight out from the building and across the two lane road," "switching directions dependent on the wind." The inspection "yielded no telltale concerns associated with overfueling, light loading, or engine malfunction," and the inspector concluded that the generator had "a very clean running diesel engine. The exhaust this unit is contributing to

---

[2] This recommendation was based on the consultant's observation that the generator's exhaust left the building near vents that appeared to be air intakes.

4

the neighborhood is minimal and likely only a fraction of that contributed by delivery trucks and the 4-5 other generators exhausting into the loading dock area [ ] within less than 100-150 [feet] of this one." The inspector stated that Kraft Power would perform another annual load test and a service, which would include an oil sample.

Based on the report of the maintenance company, the Association took no further action. In October 2021, Cox filed the underlying lawsuit against Ovation, asserting a claim for property damage under a nuisance theory, a claim for personal injury sounding in negligence, and a breach of contract claim under the Declaration.

Cox relied on two experts to support her claims. Robert Springer, MD, who specializes in allergy, immunology, and primary care, deposed that he treated Cox for what he thinks was an "immune-mediated reaction to a substance that appeared . . . linked to her condominium environment . . . [based o]n her repeated experience of returning to the condo environment and having her symptoms be aggravated or expressed." Springer opined that "if there was something that was absolutely toxic in her environment . . . it's a unique immune response on her part" that is "[a]bsolutely" unique to her. Springer was not able to "pinpoint the offending agent" and could not rule out mold, paint, dust, pollen, or perfume as the triggering agent for Cox's symptoms.[3] He deposed that he could not speak to what Cox had been exposed to, whether there was a dangerous level of volatile chemical compounds in

---

[3] At the time of his deposition, Cox was Springer's "sole source" that there was diesel in her unit.

her unit, or whether she had been exposed to a level above any public health or medical standard.

Cox's second expert, Benjamyn Marks, CIH, CSP, an environmental, health, and safety consultant who did not visit her condo, offered his "Declaration" which was based on his review of the Culpepper report, reports by another group, and photographs, emails, and notes. The Declaration essentially summarizes and concurs with the Culpepper report, including that Cox's unit was "negatively pressurized with respect to [its] exterior wall cavities," that combustion by-product soot identified in her unit "had similar chemical make-ups to that . . . identified on the diesel generator's exhaust pipe," and that the soot in her unit "was likely caused by the diesel generator's exhaust emissions migrating into [her unit]." During his subsequent deposition, Marks reiterated his statements in the Declaration. He also recommended that the items in Cox's unit should be cleaned appropriately, though he admitted that he had not personally examined them. Marks also conceded that he did not consider any sources for the diesel levels found in Cox's unit other than the backup generator.

Ovation moved for summary judgment, arguing that Cox could not carry her burden of proof as to her tort and contract claims; that she could not prove that Ovation's conduct was the proximate cause of any injuries she suffered; and that she could not prove damages recoverable against Ovation. In response, Cox submitted new affidavits from Springer and Marks.

Springer stated in his affidavit that after reviewing the Culpepper report, he became aware that Cox's unit was "being infiltrated" with

exhaust from the building's backup generator, which information "helped identify the environmental toxin" causing her health issues. Springer stated that he had eliminated car or truck exhaust from the road as a cause of Cox's health problems and "believe[ ]s that exposure to diesel particulates in [her] condominium is the cause of [her] symptoms because of the timing of her symptoms and [the] fact that she feels relief only while being away from the condominium."[4] Springer also opined that he "[did] not believe [Cox] is abnormal in her sensitivity to diesel exhaust. [Her] symptoms are a reasonable reaction to a repeated exposure to a known environmental toxin."

In his affidavit, Marks explained that indoor air quality assessments performed on Cox's unit during testing of the generator did not reveal any higher readings of sub-micron particulates, although a nearby unit did have "substantially higher" readings. Marks opined that discoloration in the carpeting in Cox's unit along the wall closest to the generator indicates that the carpet is filtering the generator exhaust being pulled into her unit by negative pressurization, resulting in the presence of soot "well [ ] beyond normal household levels." According to Marks, those levels of soot "can damage . . . property," and he "do[es] not believe there is any . . . plausible source for the soot" other than the backup generator.[5]

---

[4] According to Springer, "diesel exhaust . . . is a known environmental toxin that can cause deleterious health effects in otherwise healthy individuals."

[5] Both experts' affidavits are discussed in detail below.

Ovation filed motions to strike Springer's and Marks'[ ] affidavits on the grounds that they failed to meet the requirements of OCGA § 24-7-702 and *Daubert v. Merrell Dow Pharmaceuticals*[, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993)]. Without ruling on the *Daubert* motions, the trial court denied Ovation's summary judgment motion in a two-page order.[6]

*Ovation I*, 369 Ga. App. at 481-485. This Court granted Ovation's application for interlocutory appeal and vacated the trial court's order, stating

we do not know whether the trial court considered the admissibility of Cox's experts' testimony, which ruling may be dispositive of Cox's claims, each of which requires evidence of causation. Therefore, because this is a role for the trial court, and our review is limited to determining whether the trial court abused its discretion, we conclude that we must vacate the trial court's order and remand for the trial court to conduct a proper *Daubert* analysis.

(Citation and punctuation omitted.) Id. at 487.

On remand, after holding a hearing, the trial court denied both of Ovation's motions to strike and re-entered its denial of Ovation's motion for summary judgment.

---

[6] Before the trial court ruled on the summary judgment motion, Cox amended her complaint to add claims for breach of fiduciary duty and punitive damages; those claims were not addressed in the summary judgment order. *Ovation I*, 369 Ga. App. at 487, n.17. These claims also are not at issue in this appeal.

Ovation filed an application for interlocutory review, which this Court granted, and this second appeal followed. Ovation contends that the trial court erred in denying its motions for various reasons.

1. *Motions to Strike Experts' Affidavits.* "OCGA § 24-7-702 ("Rule 702") governs the admissibility of expert testimony and requires that the trial court act as gatekeeper to ensure the relevance and reliability of expert testimony." (Citation and punctuation omitted.) *Kershaw v. Princeton Properties Mgmt.*, 348 Ga. App. 779, 782 (824 SE2d 668) (2019) (physical precedent only). Under Rule 702, the trial court has broad discretion to admit or exclude expert testimony. *Miller v. Golden Peanut Co.*, 317 Ga. 22, 30 (2) (891 SE2d 776) (2023). See also *Smith v. CSX Transp.*, 343 Ga. App. 508, 510 (1) (806 SE2d 890) (2017) ("[t]he determination of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion") (citation and punctuation omitted). "The proffering party bears the burden of presenting evidence of reliability in order to meet the standards of [Rule 702]." (Citation and punctuation omitted.) *Hart v. Phung*, 364 Ga. App. 399, 406 (1) (876 SE2d 1) (2022). Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based upon sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

OCGA § 24-7-702 (b). Thus, "a trial court must assess three aspects of proposed expert testimony — the qualifications of the expert, the reliability of the testimony, and the relevance of the testimony — to discharge its responsibilities as a gatekeeper[.]" *Scapa Dryer Fabrics v. Knight*, 299 Ga. 286, 289 (788 SE2d 421) (2016) (decided under former OCGA § 24-9-67.1).

(a) We first address Ovation's contention that a statement of law in the trial court's order was erroneous. The trial court's order states: "Defendant argues that if an expert affidavit does not show on its face that each prong of OCGA § 24-7-702 is met, then it cannot be considered at summary judgment. The Court again disagrees."

In reading the trial court's order as a whole, we take the trial court's statement to mean that the trial court was not limited to the four corners of the expert's affidavit

10

in analyzing its admissibility under Rule 702, and that the trial court could also look to the expert's deposition testimony as it clearly did in its order. Contrary to Ovation's contention, we do not read this statement as "holding that expert affidavits at summary judgment are immune from *Daubert* scrutiny."

(b) *Motion to strike Dr. Springer's affidavit.* With respect to Dr. Springer's affidavit, Ovation claims that: (i) Dr. Springer lacked the necessary qualifications to opine regarding toxicological causation; (ii) his opinions were not shown to be based in reliable methodology and did not show specific causation; and (iii) his opinions lack "fit" or relevance. Ovation claims that the Springer affidavit failed to adequately specify causation since in the context of toxic causation, the two methods by which the plaintiff may show specific causation are: (1) dose/response relationship and (2) differential diagnosis.

### Dr. Springer's Deposition

Dr. Springer, who has a solo practice in primary care and immunology speciality, started seeing Cox in 2015 for hypothyroidism. Cox began having other symptoms in late 2019/2020 that could not be linked to hypothyroidism in Dr. Springer's opinion. Dr. Springer opined that Cox, "from her description and from the examination of her

in person and also with the photographs she would share with me after she was having reactions, . . . was suffering some form of immune-mediated reaction to a substance that appeared in final analysis to be linked to her condominium environment." Dr. Springer believed that this was "a unique immune response on her part" and that others exposed to her environment might not be "bothered" or have any such symptoms. Thus, Cox's "unique immune response" is "separate from a direct toxicity." Dr. Springer agreed that he was not able to pinpoint the offending agent or rule anything out as the offending agent.

### *Dr. Springer's Affidavit in Opposition to Summary Judgment*

In his five-page supplemental affidavit, Dr. Springer states, "[i]t was not until I reviewed the Culpepper Report . . . that I became aware that [Cox's] condominium unit was being infiltrated with exhaust from her condominium building's diesel generator. . . . The Culpepper Report therefore helped identify the environmental toxin causing [Cox's] health issues and explained why being away from the condominium relieved [her] symptoms." Dr. Springer "believe[s] that exposure to diesel particulates in [Cox's] condominium is the cause of [her] symptoms because of the timing of her symptoms and fact that she feels relief only while being away from the condominium."

(i) *Qualifications.* Dr. Springer has a medical degree, did his residency in a community hospital, and then completed a fellowship in allergy and immunology. He "practiced in single specialty allergy for [the first] three years," but since then has done "a mixed primary care and immunology specialty practice." Dr. Springer had not published anything since his fellowship and did not teach. When asked whether he had any experience in toxicology, Dr. Springer replied, "[n]ot directly per se." According to Dr. Springer, he had "indirect" experience in toxicology "insofar as when there is a measurable agent I'm able to reference guidelines regarding what should be reasonable exposure to certain agents." Dr. Springer had not studied the health effects of diesel particulates on the human body and had not done "anything to learn anything specific about diesel particulates on the body," as it related to Cox's case or any other case.

We agree that Dr. Springer lacks the specific knowledge, education, training, and experience to render an opinion as to whether the exposure to diesel particulates caused the specific disorder or symptoms at issue in this case. Dr. Springer is not a toxicologist and has no training or expertise in toxicology. "Although he is a clinical physician . . ., the ability to diagnose and to treat a disease[ or condition] is

substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty." *Sutera v. Perrier Grp. of America*, 986 FSupp. 655, 667 (III) (C) (2) (D. Mass. 1997).[7] See also *Cleveland v. United States*, No. CIV.A. 103-CV1963HTW, 2006 WL 5334601, at *5 (N.D. Ga. Jan. 24, 2006) (noting that the Federal Judicial Center's Reference Guide on Toxicology states: "[C]ause-and-effect determinations in toxic tort cases fall squarely within the province of toxicologists and ... medical doctors may not always be qualified to offer an expert opinion on causation: Generally, physicians are quite knowledgeable about identification of effects and their treatment. The cause of these effects, particularly if they are unrelated to the treatment of the disease, is generally of little concern to the practicing physician.") (punctuation omitted). Dr. Springer's own deposition testimony underscores this distinction:

---

[7]     [I]n interpreting and applying [Rule 702], the courts of this state may draw from the opinions of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 [113 SCt 2786, 125 LE2d 469] (1993); *General Electric Co. v. Joiner*, 522 U. S. 136 [118 SCt 512, 139 LE2d 508] (1997); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U. S. 137 [119 SCt 1167, 143 LE2d 238] (1999); and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases.

OCGA § 24-7-702 (f).

14

[Counsel:] Have you done anything to evaluate the effect of other ambient particulates on the body?

[Dr. Springer:] My clinical interests are much more on the side of the patient experience of illness and how we can assess and measure that in the body. So I've not done studies on the side of the triggering agents.

[Counsel:] Okay. When you say your focus is more on the patient experience, does that mean like you're interested in treating what is presented to you rather than figuring out what caused it?

[Dr. Springer:] Well, we like to figure out what causes any particular clinical syndrome, but my focus is always on how best to manage the patient's symptoms and to try to understand — to come to an understanding of the actual biological mechanism of a person's symptoms and help develop a treatment plan and a plan for recovery from those symptoms.

To be clear, Dr. Springer is qualified to offer testimony as to Cox's symptoms and treatment. However, given the absence of any specialized knowledge with regard to toxicology and the absence of any familiarity with the effects of diesel particulates on the human body, Dr. Springer is not qualified to give expert testimony as to whether exposure to diesel particulates caused Cox's symptoms.[8] See *Zellers v. NexTech Ne.*,

---

[8] The cases cited by Cox are inapplicable as they deal with medical malpractice claims, rather than toxic tort claims, and the specific provisions of Rule 702 dealing with professional malpractice actions, OCGA § 24-7-702 (c). See *MCG Health v. Barton*, 285 Ga. App. 577 (647 SE2d 81) (2007); *Mays v. Ellis*, 283 Ga. App. 195 (641 SE2d 201) (2007); *Cotten v. Phillips*, 280 Ga. App. 280 (633 SE2d 655) (2006);

533 FAppx. 192, 197 (III) (A) (1) (4th Cir. 2013) (plaintiff's treating neurologist lacked the requisite qualifications to offer expert testimony in the field of toxicology and thus could not offer opinion that plaintiff's symptoms were caused by exposure to refrigerant gas); *Louderback v. Orkin Exterminating Co.*, 26 FSupp. 2d 1298, 1302 (1) (a) (D. Kan. 1998) (neuropsychologist could testify as to his opinion that the plaintiffs were suffering from cognitive and other deficits and his opinion as to the extent and duration of those problems but lacked sufficient expertise in the area of toxicology to offer an opinion that the cognitive and other deficits he found were caused by exposure to chlorpyrifos; expert did not have training, education, or experience in toxicology and his deposition testimony indicated a lack of familiarity with significant and relevant scientific literature on this topic); *Sutera*, 986 FSupp. at 667 (III) (C) (2) (plaintiff's treating physician, an oncologist and hematologist, was not qualified to render an opinion as to whether exposures to low levels of benzene for a short time period caused the specific disease at issue; he had not done any original research or published any papers about benzene, its properties, or its leukemogenic effects and his familiarity with literature linking benzene to leukemia was "quite limited").

---

*Abramson v. Williams*, 281 Ga. App. 617 (636 SE2d 765) (2006).

(ii) Given our conclusion above, we need not address Ovation's remaining arguments in support of excluding Dr. Springer's causation testimony.

(c) *Motion to strike Marks' affidavit.* With respect to Marks' affidavit, Ovation contends that Marks' affidavit (i) improperly relies on unsworn and uncertified documents; (ii) fails to establish that his opinions are based on sufficient facts; (iii) fails to show a reliable methodology; and (iv) is conclusory and not helpful. Ovation does not challenge Marks' qualifications.

*Marks' Affidavit in Opposition to Summary Judgment*

According to his affidavit, Marks holds a Master of Science degree in health and safety management. He is a certified industrial hygienist, a certified safety professional, and the Director of Operations for Indoor Science. His affidavit states:

> I have been identified as an expert witness in this matter and am qualified to testify about the presence of combustion by-product soot in [Cox's unit] at Ovation Condominium that is originating from the backup generator at the condominium building. My opinions are based on my review of [the Culpepper Report].

With regard to the Culpepper Report, Marks pointed to the findings that the chemical composition of the soot found inside Cox's unit was similar to the soot from the diesel

17

generator's exhaust pipe; that Cox's unit is "negatively pressured," likely drawing the fumes into the units; and that the combustion by-products are staining the carpet inside Cox's unit. Marks found the Culpepper Report's "contents, methods, determinations, conclusions, and opinions to be scientifically [s]ound and free from any material defects."

Marks' opinions were also based on his company's indoor quality assessments of Cox's condo. Based on the assessments, Marks found that the air quality in Cox's unit "did not appear to have any higher readings of sub-micron particulates during the testing of the generator," but a nearby unit did have substantially higher readings during testing. According to Marks, the carpet in Cox's unit was "heavily discolored in certain areas along the exterior unit walls: namely, the wall closest to the diesel generator's location," leading him "to believe that the carpeting, which was laid more heavily along pathways of air intrusion in [Cox's unit] but not [the neighboring unit], is filtering the generator exhaust entering [Cox's unit]."

Thirdly, in reaching his conclusions, Marks looked to a carpet sampling report analyzed on September 15, 2022, at the request of Jah Environmental Safety and Health, LLC. This report showed that carpet samples taken from three different areas

in Cox's condo were analyzed by the same lab as in the Culpepper Report. The sample from an area with excessive staining had a 45 percent concentration of black carbon (soot), the sample from the hallway wall had a 25 percent concentration, and the third sample taken from an area with no staining did not contain any detectable levels of soot. Marks averred: "These findings support my conclusion that the carpet in [Cox's unit] is causing soil filtration[9] of the generator exhaust. These findings also definitely establish the presence of combustion by-product soot in [Cox's unit] in well-beyond normal household levels, which is typically a 1-2[ percent] concentration."

Marks ultimately concluded as follows:

> All of this evidence proves to me that the source of the soot found in the carpet of [Cox's unit], and found in the Culpepper Report, is [from the] backup diesel generator. This is due to the location of the generator, matching similar chemical makeups of the soot inside [Cox's unit] and on the generator, evidence of soil filtration, the substantially high amount of soot concentration in the carpet sampling, and the general indoor

---

[9] In Marks' "Declaration," he explained:
Discoloration around edges and/or localized areas of carpet flooring caused by air passing through or over the carpet tends to deposit airborne particles, which is commonly known as filtration soiling. Observations of filtration soiling are indicators that the indoor environment is or has been under negative pressure.
(Footnote omitted.)

19

acceptable/anticipated levels of a condominium located even in a dense urban area. I do not believe there is any other plausible source for the soot[.] Levels of soot this high can damage both real and personal property[.]

Attached to Marks' affidavit was (1) the Culpepper report, (2) a report from Marks' company, Indoor Science, after conducting indoor air quality assessments, and (3) the carpet sampling report from Cox's unit analyzed at the request of Jah Environmental Safety and Health, LLC. The exhibits were unsworn and uncertified.

*Indoor Science's Report*

According to its report, Marks' company, Indoor Science, "conducted particulate matter monitoring using an optical particle counter" in June 2022, in order to "further evaluate the migration of the building's back-up diesel generator's exhaust emissions into [Cox's unit]." Indoor Science performed the particulate monitoring prior to and during operation of the generator with the air-handling units turned on and off. It chose measurement locations based on professional judgment and observations of staining from dark particle accumulation, ultimately testing five locations inside Cox's unit and four locations around the generator room. Results were listed in a chart included in the report and showed that "the measurement locations in [the other unit]

are experiencing infiltration of the diesel generator's exhaust emissions. The particulate monitoring results for [Cox's unit] did not indicate that any of the measurement locations are experiencing particulate infiltration." Referencing the findings in the Culpepper Report, Indoor Science noted that "the carpet in [Cox's unit] may be restricting airflow at pathways of particulate migration" and this "may have contributed towards the particulate monitoring results of [Indoor Sciences'] assessment." The report detailed Indoor Science's methodology and results, included an instrumentation calibration record, and stated it "conducted this assessment following industry best practices and performed assessment protocols that are consistent with those exercised by other reputable consultants, based on current industry standards of practice[.]"

(i) Ovation first contends that the trial court abused its discretion by holding that sworn, certified copies of records need not be attached to summary judgment affidavits. Specifically, Ovation argues that the trial court erred in holding that the uncertified, unsworn records attached to Marks' affidavit were sufficient despite the clear mandate of OCGA § 9-11-56 (e).

21

OCGA 9-11-56 (e) requires sworn or certified copies of documents to be attached to an affidavit supporting or opposing a motion for summary judgment. Thus, "[w]e have held that an expert affidavit is insufficient to oppose a motion for summary judgment if the documents on which the affiant relies in forming his opinion are not certified or sworn, even if unsworn copies are attached to the affidavit." (Citation and punctuation omitted.) *Rudd v. Paden*, 279 Ga. App. 141, 142-143 (1) (630 SE2d 648) (2006). However, we have also held that such omission "does not, by itself, automatically preclude consideration of [the expert's] affidavit in our summary judgment analysis." *Jones v. Orris*, 274 Ga. App. 52, 57 (2) (616 SE2d 820) (2005). "An affidavit need not attach material upon which it is based if that material is part of the record in the case and is before the trial court, provided that the affidavit clearly identifies the record matter upon which it is based." (Citation and punctuation omitted.) Id. See also *Paulin v. Okehi*, 264 Ga. 604 (449 SE2d 291) (1994) (uncertified records produced and authenticated by defendant physician and placed in the record were sufficient support to plaintiffs' opposing affidavit as to satisfy the requirements of OCGA § 9-11-56 (e)).

We find no merit in Ovation's argument with regard to the Culpepper Report and Marks' own report. The Culpepper Report is part of the record and is clearly identified in Marks' affidavit. See *Howard v. McFarland*, 237 Ga. App. 483, 488 (3) (b) (515 SE2d 629) (1999). Marks' report was prepared by his company and is signed by Marks himself.

However, after reviewing the extensive record in this case, it does not appear that the carpet sampling report attached to Marks' affidavit as Exhibit 3 is otherwise part of the record. Accordingly, we conclude that the portion of Marks' affidavit relying on the carpet sampling report should be excluded in considering the motion for summary judgment.[10]

(ii) Ovation argues that Marks' affidavit fails to establish that his opinions are based on sufficient or reliable facts. Specifically, Ovation takes issue with the fact that Marks never personally visited the building or Cox's unit and "the only information identified in his affidavit are unsworn hearsay reports about after-the-fact testing by others." We find no merit in this argument.

---

[10] We note that this is not a basis to exclude Marks' testimony, nor does it factor into whether Marks' affidavit meets the requirements of Rule 702. See, e.g., *Fields v. Taylor*, 340 Ga. App. 706, 710 (2) (a) (797 SE2d 127) (2017).

In *Daubert*, the Supreme Court explained that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." 509 U. S. at 592 (II) (B). Thus, Marks need not have personally visited Cox's unit or personally inspected the generator to have a sufficient factual basis for his opinion. See *Monsanto Co. v. David*, 516 F3d 1009, 1015 (A) (Fed. Cir. 2008) ("an expert need not have obtained the basis for his opinion from personal perception"). Marks based his opinion on the various reports discussed in his affidavit, photographs, and the on-site testing performed by his company.[11] With regard to Marks' reliance on "hearsay reports," it is well established that "an expert properly may rely on inadmissible facts and data such as hearsay in reaching his opinion, if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Evans v. Dept. of Transp.*, 331 Ga. App. 313, 319 (2), n. 3 (771 SE2d 20) (2015), citing OCGA § 24-7-703 and *United States v. Garcia*, 447 F3d 1327, 1336 (11th Cir. 2006) (noting that a witness testifying as an expert "may rely on information he received from other people if such sources of

---

[11] In his deposition, Marks testified that he spoke with Cox as well as the owner of the nearby unit that was also tested. He also identified reports he reviewed other than those listed in his affidavit.

information were regularly relied upon by experts in his field") (citation and punctuation omitted). See also Milich, Ga. Rules Of Evidence § 15:12 ("[t]he term 'data' is intended to encompass the reliable opinions of other experts"). Such facts and data are sufficiently reliable to support the opinion of Marks — an environmental and industrial hygiene consultant — concerning the presence of soot in Cox's unit and its source.

(iii) Ovation also argues that Marks' affidavit fails to show a reliable methodology for various reasons. We disagree.

First, Ovation argues that Marks failed to consider other possible sources of the soot in Cox's unit. See *Smith*, 343 Ga. App. at 513 (1) (b) ("In deciding whether an expert employed a reliable method, the . . . court has discretion to consider whether the expert has adequately accounted for obvious alternative explanations.") (citation and punctuation omitted). In support of this contention, Ovation points to the following excerpt from Marks' deposition:[12]

> [Marks:] With diesel soot, there's ingredients in there that are pretty exclusive, and they are . . . characteristic of what we found here on the indoor sample in the source.

---

[12] The record contains only a portion of Marks' deposition.

25

[Defense Counsel:] Right. But you would also have to look at other diesel sources, wouldn't you, sir?

[Marks:] Yeah, I mean, could soot be there from a lot [of] different sources? Yes, it could. And that's why you do the source EDS analysis, to determine if it's similar to what you're looking at.

. . .

[Marks:] I did not consider any other diesel source to be the primary reason of the soot accumulation.

Marks agreed that a hypothetical generator in the building next door could be a potential source. He also agreed that nearby commercial facilities could be other sources if they had a diesel generator. Based on Marks' deposition testimony, as well as his affidavit, Marks was aware that Cox's condominium was "a high-rise residential" in a "metropolitan downtown area."

In his affidavit, Marks states "I do not believe there is any other plausible source for the soot found in [Cox's unit]." Marks pointed to the location of the generator, the general indoor acceptable/anticipated levels of a condominium located even in a dense urban area, and the Culpepper Report's finding that the "presence of soot was confirmed by TEM analysis and EDS analysis confirmed that the chemical make-up of the soot detected inside the unit is similar to the chemical make-up of the soot

detected on the diesel generator exhaust pipe."[13] Thus, Marks' conclusion that there was not "any other plausible source for the soot found in [Cox's unit]" was supported by the data in the Culpepper Report. Marks was aware of and considered the unit's location in an urban area and the general indoor acceptable levels of a condominium in such an area. "[Ovation] has fair criticisms of [Marks'] efforts to rule out alternative sources, but those criticisms speak more to the accuracy of his conclusions than the reliability of his approach. Even if [Marks'] opinions may be imperfect, he considered and dismissed potentially confounding sources . . . for rational reasons." *Prantil v. Arkema France S.A.*, No. 4:17-CV-02960, 2022 WL 1570022, at *21 (III) (F) (ii) (S.D. Tex. May 18, 2022).

According to Ovation, Marks also disregarded data that cut against his opinion, pointing to the results of Indoor Science's particulate monitoring showing that Cox's unit did not have heightened levels of particulates while the generator was running. Again, Marks provided a rational explanation for these results: that the heavily discolored areas of carpeting could be restricting airflow at pathways of particulate migration and causing soil filtration of the generator exhaust. He further supported this

---

[13] TEM refers to transmission electron microscopy and EDS refers to energy dispersive x-ray spectroscopy.

27

reasoning with the results from the carpet sampling report which showed that a carpet sample from one of the most heavily stained areas had a 45 percent concentration of soot while a sample taken from an area with no staining had no detectable levels of soot.

Ovation also contends that Marks' affidavit is "a mere conduit for the opinions of others." While portions of Marks' affidavit refer to the findings of the Culpepper Report and the carpet sampling report, the affidavit also relies on the report and findings from Marks' own company. Moreover, Marks found the methods and conclusions of the other reports to be sound and reliable. We disagree that Marks' opinion was merely a restatement of the other reports' findings. Rather, the information from the other reports in conjunction with Marks' own findings and expertise led to his opinion. See, e.g., *Rushing v. Yeargain*, No. CV-19-653-JWD-SDJ, 2022 WL 4545612, at *10 (V) (D) (M.D. La. June 10, 2022)("[a] methodology often allowed under the *Daubert* rubric is for an expert to base his or her opinion on a review of records supplied by others (including other expert reports) and, based on the expert's professional training and knowledge, render an expert opinion within his or her area of expertise"). See also *Monsanto Co.*, 516 F3d at 1015 (A) ("numerous courts

have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts").

In sum, "[t]he trial court has substantial discretion in deciding how to test an expert's reliability," *Cash v. LG Electronics*, 342 Ga. App. 735, 737 (1) (804 SE2d 713) (2017) (citation and punctuation omitted), and we find no abuse of discretion in the trial court's conclusion that Marks employed a reliable methodology to conclude that soot was present in Cox's apartment and that the source of the soot is the backup diesel generator. See *Wilson v. Redmond Constr.*, 359 Ga. App. 814, 822 (4) (860 SE2d 118) (2021) (affirming trial court's denial of motion to exclude expert testimony based on methodology where expert formed his opinion based, in part, on another expert's report).

(iv) Ovation also argues that Marks' affidavit is not helpful because "it fails to identify what level of soot can cause what sort of health effect or damage any particular type of material, much less to show that Cox or her property were exposed to such levels." Again, we disagree.

Whether the expert testimony is helpful to the trier of fact is a "condition [that] goes primarily to relevance." *Daubert*, 509 U. S. at 591 (II) (B). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (Citation and punctuation omitted.) Id. See also *Scapa*, 299 Ga. at 290 ("expert testimony is helpful to the trier of fact only to the extent that the testimony is relevant to the task at hand and logically advances a material aspect of the case") (citation and punctuation omitted). We conclude that Marks' opinions, including that combustion by-product soot is present in Cox's condominium and that the most probable source of the soot is the backup generator, are relevant to the issues of the case and will be helpful to the trier of fact.

2. *Motion for Summary Judgment.* Ovation asserts that the trial court erroneously denied summary judgment in its favor, contending that Cox has failed to carry her burden on proximate causation because there was no evidence of general or specific causation. Ovation also asserts that it is entitled to summary judgment on Cox's claims for nuisance and breach of contract. In reviewing the denial of a summary judgment motion, we construe the evidence and all inferences and conclusions arising therefrom

30

most favorably toward the party opposing the motion. *Yim v. Carr*, 349 Ga. App. 892, 893 (1) (827 SE2d 685) (2019).

(a) *Causation.* Ovation argues that Cox did not carry her burden of proving either general or specific causation as to her toxic tort claim. We agree that Cox has failed to show specific causation.

"In a toxic tort case, the plaintiff must prove both general causation, that a substance is capable of causing a particular injury or condition, and specific causation, that a substance made a meaningful contribution to a particular individual's injury." (Citation and punctuation omitted.) *Wadley v. Mother Murphy's Laboratories*, 357 Ga. App. 259, 263 (1) (850 SE2d 490) (2020). "Where, as here, the case involves a 'specialized medical' question, expert testimony is required to establish causation." *Kershaw v. Princeton Properties Mgmt.*, 348 Ga. App. 779, 782 (824 SE2d 668) (2019). See also *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 30 (2) (712 SE2d 537) (2011) ("Causation is an essential element of a toxic tort case, and proof of causation in such cases generally requires reliable expert testimony.") (citation and punctuation omitted). Thus, "[a]bsent reliable expert testimony that exposure to [diesel particulates from the generator at Cox's condominium] contributed to the

development of [Cox's condition], there is insufficient evidence to create a jury issue as to causation." *Butler*, 310 Ga. App. at 30 (2). The only evidence offered by Cox on the issue of specific causation is the expert testimony of Dr. Springer.[14] Given our conclusion that the trial court should have excluded Dr. Springer's expert testimony on specific causation, Ovation was entitled to summary judgment on Cox's claims for personal injury.[15]

---

[14] While Cox seems to argue in her brief that Marks' affidavit establishes specific causation, Marks' own testimony and affidavit clearly belie this contention. During the deposition, Marks was asked whether he was "here as an expert to offer that some toxin in Ms. Cox's unit is more likely than not the cause of any particular ailment." Marks responded, "I wouldn't go that far, no." Marks clarified:

> I would go up to the point where I would identify environmental contaminants that can cause adverse health effects. I wouldn't say this is what's causing her adverse health effect. . . . You know, what I'm doing is evaluating exposures, what contaminants are present, what potential exposures could be, . . . and what the resulting adverse health effects potentially could be. But I don't make the conclusion that A caused this adverse health effect.

[15] For this reason, we do not address Ovation's contentions with regard to general causation for Cox's toxic tort claim.

To the extent Cox asserts a claim for property damage allegedly caused by Ovation's negligence, we conclude that an issue of fact remains as to causation based on the evidence, including Marks' testimony.

(b) *Nuisance.* Ovation also moved for summary judgment on Cox's nuisance claim, contending that (i) it was barred by the statute of limitations; (ii) Cox's "unique immune response" cannot constitute a nuisance; and (iii) the lawful operation of the generator cannot be a nuisance.

(i) Ovation asserts that Cox's nuisance claim is permanent in nature, accrued when the generator was installed in 2005-2006, and thus is barred by the four-year statute of limitation. See OCGA § 9-3-30 (a).

> The classification of a nuisance as continuing or permanent directly controls the manner in which the statute of limitation will be applied to the underlying claim. A nuisance, permanent and continuing in its character, the destruction or damage being at once complete upon the completion of the act by which the nuisance is created, gives but one right of action, which accrues immediately upon the creation of the nuisance, and against which the statute of limitation begins, from that time, to run. Where a nuisance is not permanent in its character, but is one which can and should be abated by the person erecting or maintaining it, every continuance of the nuisance is a fresh nuisance for which a fresh action

33

will lie. This action accrues at the time of such continuance, and against it the statute of limitation runs only from the time of such accrual.

(Citation and punctuation omitted.) *Dept. of Transp. v. Mixon*, 355 Ga. App. 463, 466 (2) (844 SE2d 524) (2020).

Here, Cox's complaint alleges that Ovation's "use and operation of the Ovation Generator is a continuing, abatable Nuisance pursuant to OCGA § 41-1-1." Specifically, it states:

Since the construction of the Ovation Building in 2005, Ovation has failed to adequately maintain and seal the stucco wall structure adjacent to [Cox's unit] . . . [and] has failed to adequately ensure the appropriate diesel exhaust termination point to ensure hazardous toxins do not travel into [Cox's unit] or other residential units.

It further alleges that diesel particulates from the generator "substantially and repeatedly flow into the wall cavity and interior space of [Cox's unit] as a result of the termination point location[ and] air-flow dynamics[.]" "As a result of the continued Ovation Generator operation, [Cox's unit] including wall cavity materials, construction materials, surface materials and items and things placed within [her unit] [have] been contaminated with diesel exhaust . . . particulates thereby causing damage."

To the extent Cox's claim is based on Ovation's failure to maintain the generator, the nuisance is continuing in nature. Cox is, "therefore, allowed to contend that [Ovation's] maintenance of the [generator] within the four years preceding [her] lawsuit created a nuisance." See *Kleber*, 285 Ga. at 417 (1).

(ii) Ovation contends that Cox's unique immune response cannot constitute a nuisance because OCGA § 41-1-1, defining nuisance, provides: "The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man." Assuming without deciding that Cox may pursue a claim for personal injuries under a theory of nuisance, see *Blondell v. Courtney Station 300 LLC*, 362 Ga. App. 1, 14 (3) (b) (865 SE2d 589) (2021), she has failed to establish causation as discussed in Division 2 (a), supra.

(iii) Citing the Georgia State Minimum Standard Building Code, Ovation argues that it is required to maintain and test an emergency generator and its lawful operation of the generator cannot be a nuisance. See *Kempton v. Southern Flavor Real Estate, L.P.*, 362 Ga. App. 137 (866 SE2d 862) (2021) ("[T]hat which the law authorizes to be done, if done as the law authorizes, cannot be a nuisance. Thus, where

35

the act is lawful in itself, it becomes a nuisance only when conducted in an illegal manner to the hurt, inconvenience or damage of another.") (citation and punctuation omitted).

We find no merit in this argument. The fact that Ovation was required by the Standard Building Code[16] to install and test an emergency generator does not mean that Ovation's maintenance and operation of the generator was not a nuisance. In other words, a question of fact at least remains as to whether Ovation has maintained or operated the generator "in an illegal manner to the hurt, inconvenience or damage of another." *Kempton*, 362 Ga. App. at 137. Cf. *Sumitomo Corp. of Am. v. Deal*, 256 Ga. App. 703, 708 (3) (569 SE2d 608) (2002) ("construction of the detention pond was arguably done in a lawful manner, [but] that fact did not prevent the pond from becoming a nuisance when the increased water flow caused hurt and inconvenience to [nearby property owners]").

(c) *Breach of Declarations.* Cox alleged in her complaint that Ovation breached its duty under the Declarations to maintain and keep in good repair the generator. On appeal, Ovation contends that it has offered evidence in support of its motion for

---

[16] We note that the relevant portions of the Georgia State Minimum Standard Building Code are not part of the record.

summary judgment that it complied with this duty. Specifically, Ovation points to the report provided by Kraft Power, the company under contract to maintain the generator, following its inspection of the generator in 2021. According to Ovation, this report shows that the generator was properly maintained and operating without issue, and Cox has offered no admissible countervailing evidence.

Cox put forth an e-mail from the Kraft Power service manager to Ovation's general manager which states the following:

> As we discussed last week, I have some concerns about the sharp 90 degree turns in the exhaust. We definitely need to measure backpressure during the upcoming load bank testing. I did find a load bank report from [ ] 2-3 years ago that showed the unit was unable to reach 100[ percent] rated load and in fact it was dro[p]ping speed considerably at only 250kW. The unit dro[p]ped to 58 hertz at 250kW instead of holding 60 hertz at 300kW, full load. Continued operation with this restricted exhaust will absolutely cause excessive smoke. (However, the exhaust did not appear to be excessive during the run when we were there last week). This gives me mixed thoughts and we must investigate further.

The e-mail was sent on August 24, 2021. The report from Kraft Power, dated September 9, 2021, mentions that it soon "will perform another annual load bank test pursuant to your request and during this testing we will measure exhaust temperatures

and pressures to ensure the engine is functioning properly. . . . Once we complete the additional testing I will provide a final report with any recommendations." It is unclear if any additional testing was done or if Kraft Power issued "a final report." The Kraft Power report also included the service manager's opinion that

> you have a very clean running diesel engine. The exhaust this unit is contributing to the neighborhood is minimal and likely only a fraction of that contributed by delivery trucks and the 4-5 other generators exhausting into the loading dock area, within less than 100-150[ feet] of this one.

The record contains reports of generator maintenance during the years 2018 to 2022, but nothing prior to 2018. Viewing the evidence in the light most favorable to Cox, we conclude that an issue of material facts remains as to whether Ovation maintained and kept "in good repair the generator" for the applicable period.

*Judgment affirmed in part, reversed in part. Padgett, J., concurs. Dillard, P. J. , concurs fully in Division 1 and Division 2 (a) and (c) and concurs in judgment only in Division 2 (b).*